UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————————————
ISABEL M. AVILA,

                        Plaintiff,              11 Civ. 9048 (JGK)

        - against -                            OPINION AND ORDER

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

                        Defendant.
————————————————————————————————

JOHN G. KOELTL, District Judge:

        The plaintiff, Isabel Avila, brought this action to reverse
a final decision of the defendant, the Commissioner of Social
Security (the "Commissioner"), that the plaintiff was not
entitled to Supplemental Security Income ("SSI") benefits.  The
plaintiff filed an application for SSI benefits on July 20,
2009, alleging that her disability began on February 2, 2005.
Her application was denied initially on September 15, 2009.
After a hearing on March 21, 2011, an Administrative Law Judge
("ALJ") denied the plaintiff's application on April 26, 2011,
finding that the plaintiff was not disabled.  The ALJ's decision
became the final decision of the Commissioner after the Appeals
Council declined to review it on October 20, 2011.  The parties
have filed cross-motions for judgment on the pleadings pursuant
to Rule 12(c) of the Federal Rules of Civil Procedure.

## I.

The administrative record contains the following facts.

The plaintiff testified at a hearing before the ALJ on March 21, 2011. (Tr. 21-31.) The plaintiff was 53 years old at the time of the hearing (Tr. 99), and her most recent relevant work was as a messenger (Tr. 24, 117-19). She alleges that she became disabled on February 2, 2005 (Tr. 39, 99), when she began experiencing physical and psychological impairments including arthralgias,[1] major depressive disorder, anxiety, insomnia, and anemia (Pl.'s Br. at 3). The ALJ did not call a vocational or medical expert to testify at the hearing. (Tr. 21-31.)

The plaintiff testified that she lived in an apartment by herself. (Tr. 23-24.) She testified that she most recently worked for two to three years as a messenger, which required her "to go from one building to one other building from the same company," until she was released in 2006. (Tr. 24, 117-19.) She stated that during the course of her eight-hour workday, she walked for two hours, stood for two hours, and lifted no more than ten pounds. (Tr. 118.) She stated that she was fired from her job for reasons other than her impairment. (Tr. 24, 117.)

---

[1] "Arthralgia" is defined as "pain in the joints." American Medical Association, Encyclopedia of Medicine 131 (Charles B. Clayman ed., 1989).

The plaintiff testified that she suffered from severe pain and discomfort in her hands, back, and left leg (Tr. 24-25), caused by arthritis (Tr. 28).  She claimed that her pain medication did little to relieve her pain.  (Tr. 25.)  She stated that she did not wear a back brace, and that she had not attended physical therapy.  (Tr. 25.)  In addition to pain, she testified that she experienced swelling throughout her body, especially in her hands.  (Tr. 27-28.)

The plaintiff testified that her physical impairments made it difficult for her to care for herself.  (Tr. 28.)  She stated that it took her "three to four hours" to get ready in the morning because of the pain she experienced.  (Tr. 28.)  She testified that she could stand for no more than twenty-five minutes at a time, could sit for only twenty-five minutes continuously, could walk for three blocks at a time, and could lift light grocery bags.  (Tr. 26-27.)  She stated that she traveled by subway, cooked light meals, cleaned her apartment, and watched television.  (Tr. 27.)

The plaintiff testified that she also suffered from depression and anxiety.  (Tr. 25-26.)  She stated that she was seeing a psychiatrist once a month and a therapist once a week.  (Tr. 25-26.)  She testified that despite treatment she continued to experience difficulty concentrating, as well as fortgetfulness and trouble sleeping.  (Tr. 29.)  She claimed

that she had to "write down everything" because she was forgetful, had trouble concentrating because her "concentration [was] not good," and that she slept only two hours per night due to sleep difficulties. (Tr. 29.)

The plaintiff was evaluated at the Federation Employment and Guidance Service, Inc. ("FEGS") on February 23, 2009, and a summary of the evaluation was prepared on July 15, 2009. (Tr. 203-240.) Rose Chan, M.D., examined the plaintiff and reported inflammation in several joints. (Tr. 220, 224, 231, 234.) The report indicated that the plaintiff had difficulty grasping and holding objects, as well as walking or standing for long periods. (Tr. 224, 231, 234.) As to her daily life activities, the plaintiff reported that she prepared meals, did laundry, washed dishes, vacuumed, swept, mopped floors, made her bed, shopped for groceries, and socialized. (Tr. 214.) The plaintiff completed a Patient Health Questionnaire ("PHQ-9") at FEGS and received a score of 9, which correlated to mild depression. (Tr. 213, 215, 226, 236.) Dr. Chan diagnosed the plaintiff with depression, rheumatoid disorder, and hyperlipidemia. (Tr. 224, 231, 234.) Dr. Chan determined that the plaintiff could perform low-stress work, but that the plaintiff's "possible rheumatoid arthritis" was an unstable medical condition requiring a wellness plan before a functional capacity outcome could be made. (Tr. 224-25.)

The plaintiff saw Lawrence Hitzeman, M.D., three times--in May, September, and December of 2009. (Tr. 170-97.) When the plaintiff saw Dr. Hitzeman on May 12, 2009, the plaintiff reported suffering from "chronic pain in her bones especially in her left leg" and experiencing some swelling. (Tr. 174.) The plaintiff reported that she was "unable to walk more than one block" due to the pain. (Tr. 174.) Dr. Hitzeman indicated that the plaintiff had joint pain, morning stiffness, and muscle pain. (Tr. 174.) He found "1+ edema" in the plaintiff's lower left extremity. (Tr. 175.) However, on examination, Dr. Hitzeman observed that the plaintiff's gait was normal, and that she demonstrated normal muscle strength, muscle tone, and reflexes, as well as a full range of motion in all joints without swelling or deformity. (Tr. 175.) Based upon the examination, Dr. Hitzeman diagnosed the plaintiff with major depression, insomnia, arthralgias, external hemorrhoids, and constipation. (Tr. 175.) He started the plaintiff on Anaprox in an attempt to alleviate the symptoms of her arthralgias, and Ambien to help her sleep. (Tr. 175.) Although the plaintiff stated that her depression was gone, Dr. Hitzeman expressed the belief that "many of her symptoms may be explained by depression . . . ." (Tr. 175.) He indicated that the plaintiff was unable to work for at least twelve months. (Tr. 172.)

The plaintiff saw Dr. Hitzeman again on September 10, 2009. (Tr. 176-77.)  Dr. Hitzeman confirmed his diagnosis of major depression, for which he prescribed Cymbalta.  (Tr. 176-77.)  He also added Vicoprofen for the plaintiff's arthralgias and Trazodone for her insomnia.  (Tr. 177.)  He noted that the plaintiff's symptoms may be caused by fibromyalgia.  (Tr. 177.) Upon examination, Dr. Hitzeman observed that the plaintiff's gait was normal, that she demonstrated normal muscle strength, muscle tone, and reflexes, and that there was "no edema."  (Tr. 176.)  He assessed major depression, insomnia, arthralgias, external hemorrhoids, and constipation.  (Tr. 176.)

The plaintiff saw Dr. Hitzeman once more on December 22, 2009.  (Tr. 179-84.)  Dr. Hitzeman noted that the plaintiff had pain with standing, and that her hemorrhoids were causing extreme bleeding.  (Tr. 179.)  Dr. Hitzeman again observed that the plaintiff's gait was normal and that she demonstrated normal muscle strength, muscle tone, and reflexes, and that there was "no edema."  (Tr. 179.)  He assessed major depression, insomnia, arthralgias, external hemorrhoids, constipation, anemia, and hypercholesterolemia.  (Tr. 179.)

On September 1, 2009, Jerome Caiati, M.D., performed a consultative orthopedic examination of the plaintiff at the request of the Social Security Administration ("SSA").  (Tr. 141-45.)  Upon examination, Dr. Caiati observed that the

6

plaintiff's gait and station were normal.  (Tr. 142.)  As to her daily life activities, the plaintiff told Dr. Caiati that she cleaned, did laundry, and went shopping.  (Tr. 141.)  Dr. Caiati noted that the plaintiff demonstrated full muscle strength and a full range of motion as well as normal reflexes and sensations throughout her arms and legs, and exhibited no joint inflammation or instability in her arms and legs.  (Tr. 142.) He also noted that the plaintiff had no difficulty changing for the examination, getting on and off of the examination table, or rising from a seated position.  (Tr. 142.)  Her spine exhibited a full range of motion with no tenderness, and she demonstrated full grip strength bilaterally.  (Tr. 142.)  Dr. Caiati diagnosed the plaintiff with hypertension and a "[h]istory of pain in all bones and joints, etiology unclear."  (Tr. 143.)  He concluded that "[f]rom a musculoskeletal point of view, sitting, standing, walking, reaching, pushing, pulling, lifting, climbing, and bending are unrestricted."  (Tr. 143.)

Also on September 1, 2009, Haruyo Fujiwaki, Ph.D., performed a consultative psychological examination of the plaintiff for the SSA.  (Tr. 137-40.)  The plaintiff reported that she cooked once a month, did laundry, cleaned, shopped for groceries, and traveled independently via public transportation. (Tr. 139.)  Dr. Fujiwaki noted that the plaintiff had a normal appetite, experienced depression off and on for a while due to

medical problems, reported anxiety and difficulty falling asleep, and denied having manic or psychotic symptoms. (Tr. 137.) He observed that the plaintiff's manner of relating, social skills, and overall presentation were fair; that her speech and language skills were adequate; that her thought processes were coherent and goal-directed; that her mood and affect were irritable; that her attention, concentration, and memory skills were mildly impaired; that her insight and judgment were fair; and that her intellectual functioning was below average. (Tr. 138-39.) Dr. Fujiwaki diagnosed the plaintiff with depressive disorder and anxiety disorder, and recommended that the plaintiff receive psychological and psychiatric treatment. (Tr. 139-40.) Dr. Fujiwaki concluded:

> Vocationally, she is able to follow and understand simple directions and instructions. She can perform simple tasks independently. She has some difficulty maintaining attention and concentration. She is able to maintain a regular schedule with some difficulty due to emotional distress secondary to physical pain. She can learn new tasks with extended time. She can perform complex tasks with some difficulty and needs supervision. She can make some simple decisions. She may have some difficulty relating with others and dealing with stress appropriately. Difficulties are caused by fatigue, physical pain, and lack of support system.

(Tr. 139.)

On September 14, 2009, R. Nobel, Ph.D., a state agency psychologist, reviewed the record and assessed the plaintiff's

condition.  (Tr. 146-63.)  Dr. Nobel assessed that the plaintiff had depression and anxiety, but that her depression and anxiety were not of listings-level severity.  (Tr. 146, 149, 151.) Specifically, he opined that although the plaintiff had an affective disorder of depression and an anxiety-related disorder, her conditions did not satisfy the diagnostic criteria of impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 12.04 and 12.06.  (Tr. 149, 151.)  He assessed that the plaintiff was mildly restricted in performing daily life activities, and had moderate difficulties in maintaining social functioning and concentration.  (Tr. 156.)

Upon assessing the plaintiff's residual functional capacity, Dr. Nobel indicated that the plaintiff was "not significantly limited" in ten categories:

- The ability to remember locations and work-like procedures;
- The ability to carry out very short and simple instructions;
- The ability to sustain an ordinary routine without special supervision;
- The ability to work in coordination with or proximity to others without being distracted by them;
- The ability to make simple work-related decisions;
- The ability to ask simple questions or request assistance;
- The ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes;
- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness;
- The ability to be aware of normal hazards and take appropriate precautions; and
- The ability to travel in unfamiliar places or use public transportation.

(Tr. 160-61.)

Dr. Nobel also indicated that the plaintiff was "moderately limited"[2] in nine categories:

- The ability to understand and remember detailed instructions;
- The ability to carry out detailed instructions;
- The ability to maintain attention and concentration for extended periods;
- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;
- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;
- The ability to interact appropriately with the general public;
- The ability to accept instructions and respond appropriately to criticism from supervisors;
- The ability to respond appropriately to changes in the work setting; and
- The ability to set realistic goals or make plans independently of others.

(Tr. 160-61.)

Dr. Nobel did not find that the plaintiff was "markedly limited"[3] in any categories.  Dr. Nobel opined that the plaintiff could perform simple, low-level work.  (Tr. 162.)

_____

[2] A claimant's degree of limitation in certain functional areas is rated on the following five-point scale: none, mild, moderate, marked, and extreme.  20 C.F.R. § 416.920a(c)(4).

[3] When "marked" is used as a standard for measuring the degree of limitation, "it means more than moderate but less than extreme." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00 ¶ C.  "A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [the

On March 11, 2011, Pablo Ibanez, M.D., completed a Psychiatric/Psychological Impairment Questionnaire at the request of the plaintiff's counsel. (Tr. 247-53.) Dr. Ibanez noted that he had seen the plaintiff in November 2010, and that her frequency of treatment was weekly therapy and monthly medication management. (Tr. 247.) He diagnosed the plaintiff with major depressive disorder and assigned her a global assessment of functioning ("GAF") score of 55.[4] (Tr. 247.)

Dr. Ibanez indicated on the form that the plaintiff had the following symptoms: (1) poor memory, (2) appetite disturbance with weight change, (3) sleep disturbance, (4) mood disturbance, (5) emotional lability, (6) delusions or hallucinations, (7) recurrent panic attacks, (8) anhedonia or pervasive loss of interests, (9) paranoia or inappropriate suspiciousness, (10) feelings of guilt or worthlessness, (11) difficulty thinking or concentrating, (12) time or place disorientation, (13) social withdrawal or isolation, (14) decreased energy, (15) intrusive recollections of a traumatic experience,

---

claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." Id.; see also 20 C.F.R. § 416.920a(c)(4).

[4] A GAF scale from 0 to 100 may be used to report the clinician's judgment of the individual's overall symptom severity and level of functioning. A GAF of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text rev. 2000) ("DSM-IV-TR").

(16) persistent irrational fears, (17) generalized persistent anxiety, and (18) hostility and irritability. (Tr. 248.)

Dr. Ibanez indicated that the plaintiff was "moderately limited" in eight categories:

- The ability to remember locations and work-like procedures;
- The ability to carry out simple one- or two-step instructions;
- The ability to carry out detailed instructions;
- The ability to make simple work-related decisions;
- The ability to ask simple questions or request assistance;
- The ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes;
- The ability to travel to unfamiliar places or use public transportation; and
- The ability to set realistic goals or make plans independently.

(Tr. 249-52.)

Dr. Ibanez also indicated that the plaintiff was "markedly limited" in ten categories:

- The ability to understand and remember one- or two-step instructions;
- The ability to understand and remember detailed instructions;
- The ability to maintain attention and concentration for extended periods;
- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance;
- The ability to sustain ordinary routine without supervision;
- The ability to work in coordination with or proximity to others without being distracted by them;
- The ability to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;

- The ability to interact appropriately with the general public;
- The ability to accept instructions and respond appropriately to criticism from supervisors; and
- The ability to respond appropriately to changes in the work setting.

(Tr. 249-51.)

Dr. Ibanez opined that the plaintiff's symptoms and functional limitations were reasonably consistent with her physical and emotional impairments. (Tr. 249.) He indicated that she was experiencing episodes of deterioration in work-like settings which caused her to withdraw from the situation and/or experience an exacerbation of her symptoms. (Tr. 252.) He noted that the plaintiff "experiences agoraphobia-like s[ymptoms] which cause her to stay home/isolate most of [the] time. [She] cannot tolerate being around people." (Tr. 252.) He opined that she would miss work more than three times per month as a result of her symptoms or treatment. (Tr. 253.)

In his decision dated April 26, 2011, the ALJ evaluated the plaintiff's claim for SSI benefits pursuant to the five-step sequential evaluation process set forth in 20 C.F.R. § 416.920. (Tr. 39-47.) First, the ALJ found that the plaintiff had not engaged in substantial gainful activity since July 20, 2009, the date of her application. (Tr. 41.) Second, the ALJ found that the plaintiff had the following severe impairments: arthralgia, anxiety, and depression. (Tr. 41.) Third, the ALJ determined

that the plaintiff's impairments or combination of impairments
did not meet or medically equal any of the impairments listed in
20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 41.)  The ALJ
found that the plaintiff's arthralgia was a severe impairment
but did not meet or medically equal the listing for major joint
dysfunction.  (Tr. 41.)  The ALJ also found that the plaintiff's
mental impairments, considered singly and in combination, did
not meet or medically equal the criteria of the listings for
mental disorders.  (Tr. 41.)  Fourth, the ALJ stated:

> After careful consideration of the entire record,
> [I] find[] that the claimant has the residual
> functional capacity to perform the full range of
> medium work as defined in 20 CFR 416.967(c).
> Medium work involves lifting up to 50 pounds at a
> time,    frequently    lifting    25    pounds,
> standing/walking 6 hours in an 8-hour workday,
> pushing and pulling, sitting intermittently and
> frequent bending and stooping.  In addition, the
> claimant is limited to performing low stress,
> simple jobs due to symptoms of depression and
> anxiety.

(Tr. 42.)

The ALJ then found that the plaintiff was capable of performing
her past relevant work as a messenger, noting that "[t]his work
does not require the performance of work related activities
precluded by the claimant's residual functional capacity."  (Tr.
46.)  The ALJ therefore concluded that the plaintiff had not
been under a disability since July 20, 2009, the date of her
application.  (Tr. 46.)  He therefore concluded that the

14

plaintiff was not disabled for purposes of receiving SSI
benefits.  (Tr. 46.)

## II.

A court may set aside a determination by the Commissioner
only if it is based on legal error or is not supported by
substantial evidence in the record.  See 42 U.S.C. § 1383(c);
Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per
curiam).  Substantial evidence is "more than a mere scintilla";
it is "such relevant evidence as a reasonable mind might accept
as adequate to support a conclusion."  Richardson v. Perales,
402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB,
305 U.S. 197, 229 (1938)) (internal quotation marks omitted).

A claimant seeking SSI benefits is considered disabled if
the claimant "is unable to engage in any substantial gainful
activity by reason of any medically determinable physical or
mental impairment which can be expected to result in death or
which has lasted or can be expected to last for a continuous
period of not less than twelve months."  42 U.S.C.
§ 1382c(a)(3)(A).[5]

---

[5] The definition of disability for the purposes of disability
insurance benefits under Title II of the Social Security Act is
similar.  See 42 U.S.C. § 423(d)(1)(A).  The determination of
disability under Title II is also similar to the determination
of disability for purposes of SSI benefits under Title XVI of
the Act.  Ramos v. Apfel, No. 97 Civ. 6435, 1999 WL 13043, at *4

The analytical framework for evaluating claims of disability for SSI is defined by regulations of the Commissioner, which set forth a five-step inquiry.  See 20 C.F.R. § 416.920.  The Court of Appeals for the Second Circuit has described this five-step process as follows:

1.  The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2.  If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3.  If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations.  If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4.  If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.[6]

---

n.1 (S.D.N.Y. Jan. 12, 1999).  Cases under 42 U.S.C. § 423 are cited interchangeably with cases under 42 U.S.C. § 1382c(a)(3).  See Hankerson v. Harris, 636 F.2d 893, 895 n.2 (2d Cir. 1980).

[6] Residual functional capacity ("RFC") is an assessment of an individual's ability, despite the impairment, to meet physical, mental, sensory, and other demands of jobs based on all relevant evidence.  See 20 C.F.R. § 416.945.

> 5.   If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000) (citation omitted); see also Selian v. Astrue, 708 F.3d 409, 417-18 (2d Cir. 2013).

The claimant bears the initial burden of proving that the claimant is disabled within the meaning of the Social Security Act. See Shaw, 221 F.3d at 132. This burden encompasses the first four steps described above. See Rivera v. Schweiker, 717 F.2d 719, 722 (2d Cir. 1983). If the claimant satisfies the burden of proof through the fourth step, the claimant has established a prima facie case and the burden shifts to the Commissioner to prove the fifth step. See id. at 722-23.

When employing this five-step process, the Commissioner must consider four factors in determining a claimant's entitlement to benefits: "(1) the objective medical facts; (2) diagnoses of medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (internal quotation marks and citation omitted).

In the assessment of medical evidence, a treating physician's opinion is given controlling weight when that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record . . . ." 20 C.F.R. § 416.927(c)(2); see also Schisler v. Sullivan, 3 F.3d 563, 567 (2d Cir. 1993).  The Commissioner's regulations require that greater weight generally be given to the opinion of a treating physician rather than a non-treating physician.  See 20 C.F.R. § 416.927(c)(2).

### III.

#### A.

In this case, the plaintiff's claim alleges both physical impairments and mental impairments.  With respect to the plaintiff's physical impairments, the ALJ determined that the plaintiff had the physical residual functional capacity to perform "medium work."[7]  (Tr. 42-46.)  At the fourth step of the sequential evaluation, the ALJ considered the plaintiff's description of her past work and compared the plaintiff's residual functional capacity to the functional demands of her

---

[7] "Medium work" is defined as involving "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."  20 C.F.R. § 416.967(c).

past work.  (Tr. 46.)  The ALJ then found that the plaintiff had
the capacity to do her past work as a messenger and thus was not
disabled.  (Tr. 46.)

     There was substantial evidence to support the ALJ's
findings with respect to the plaintiff's physical impairments.
Reports from Dr. Hitzeman and Dr. Caiati support the ALJ's
finding that the plaintiff had the physical residual functional
capacity to perform medium work.  For instance, both Dr.
Hitzeman and Dr. Caiati observed that the plaintiff's gait was
normal and that she had normal muscle strength and a full range
of motion in her arms and legs.  (Tr. 142-43, 175-76.)  In
addition, Dr. Caiati noted that the plaintiff could walk and
stand up "without difficulty," and concluded that "[f]rom a
musculoskeletal point of view, sitting, standing, walking,
reaching, pushing, pulling, lifting, climbing, and bending are
unrestricted."  (Tr. 142-43.)  Given the plaintiff's physical
residual functional capacity to perform medium work, it was
reasonable for the ALJ to find that the plaintiff had the
physical capacity to do her past work as a messenger, which she
described as involving, within an eight-hour workday, walking
for two hours, standing for two hours, and lifting no more than
ten pounds.  (Tr. 118.)

     The plaintiff argues that the ALJ should have called upon
the testimony of a vocational expert.  However, the requirement

that the ALJ present the testimony of a vocational expert
applies only at the fifth step of the sequential evaluation,
where the Commissioner has the burden of demonstrating that
there are other jobs in the national economy that a claimant can
perform.  See Bapp v. Bowen, 802 F.2d 601, 603 (2d Cir. 1986);
Rosa v. Callahan, 168 F.3d 72, 77-78 (2d Cir. 1999).  By
contrast, the ALJ decided the claim in this case at the fourth
step of the sequential evaluation, where he found that the
plaintiff could do her past relevant work as a messenger.  (Tr.
46.)  Because the ALJ decided the claim at the fourth step
without needing to reach the fifth step, the plaintiff's
argument that the ALJ should have called a vocational expert is
without merit.

**B.**

**1.**

     With respect to the plaintiff's claims of mental
impairments, Social Security Regulations require the ALJ to use
a "special technique" to evaluate the claimed mental
impairments.  See 20 C.F.R. § 416.920a(a).  At step two of the
five-step procedure for evaluating disability, the ALJ must rate
the degree of functional limitation resulting from the
plaintiff's mental impairment to determine whether it is
"severe."  See id. at § 416.920a(d)(1).  If the plaintiff's

mental impairment is severe, then the ALJ must determine whether the impairment meets or is equivalent in severity to a listed mental disorder.  See id. at § 416.920a(d)(2).  If the plaintiff is found to have a severe impairment not listed in the Appendix, then the ALJ must assess the plaintiff's residual functional capacity to determine whether the plaintiff can meet the mental demands of past relevant work in spite of the limiting effects of the plaintiff's impairment and, if not, whether the plaintiff can do other work, considering the plaintiff's remaining mental capacities reflected in terms of the plaintiff's occupational base, age, education, and work experience.  See id. at § 416.920a(d)(3).

## 2.

In this case, the ALJ found that although the plaintiff had depression and anxiety, the plaintiff's mental impairments did not meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 41-42.)  In particular, the ALJ found that the plaintiff's mental impairments did not meet or medically equal the criteria of the listings for mental disorders, specifically Listings 12.04[8] and

---

[8] Listing 12.04 is the listing for "affective disorders."  See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.

12.06.[9]  (Tr. 41.)  To qualify as a listed impairment under
Listing 12.04, the claimant's impairment must satisfy the
criteria in both paragraphs A and B, or the criteria in
paragraph C, of that listing.  See 20 C.F.R. Pt. 404, Subpt. P,
App. 1, § 12.04.  To qualify as a listed impairment under
Listing 12.06, the claimant's impairment must satisfy the
criteria in both paragraphs A and B, or the criteria in both
paragraphs A and C, of that listing.  See id. at § 12.06.

       In making his finding, the ALJ first considered whether the
"paragraph B" criteria[10] for Listings 12.04 and 12.06 were
satisfied.  (Tr. 41-42.)  "To satisfy the 'paragraph B'
criteria, the mental impairments must result in at least two of
the following: marked restriction of activities of daily living;
marked difficulties in maintaining social functioning; marked
difficulties in maintaining concentration, persistence, or pace;
or repeated episodes of decompensation, each of extended
duration."[11]  (Tr. 42.)  The ALJ found that the plaintiff had
mild restriction in activities of daily living, mild
difficulties in social functioning, and moderate difficulties

---

[9] Listing 12.06 is the listing for "anxiety-related disorders."
See 20 C.F.R. Pt 404, Subpt. P, App. 1, § 12.06.

[10] See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04 ¶ B; id. at
§ 12.06 ¶ B.

[11] The paragraph B criteria are identical in § 12.04 and § 12.06.

with regard to concentration, persistence, or pace, and that the plaintiff had experienced no episodes of decompensation of extended duration.  (Tr. 42.)  The ALJ then determined that the paragraph B criteria were not satisfied "[b]ecause the claimant's mental impairments do not cause at least two marked limitations or one marked limitation and repeated episodes of decompensation, each of extended duration."  (Tr. 42.)

The ALJ also considered whether the "paragraph C" criteria[12] for Listings 12.04 and 12.06 were satisfied.  (Tr. 42.)  The paragraph C criteria are extreme functional limitations specific to the particular listing at issue.  The ALJ determined that the evidence failed to establish the presence of the "paragraph C" criteria in this case because "the claimant has not had repeated episodes of decompensation, there is no evidence of a residual disease process, and she can both live outside a highly supportive living arrangement and function outside her own home."  (Tr. 42.)

Before proceeding to the next step of the analysis, the ALJ noted that the limitations identified in the paragraph B criteria are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process, whereas the mental residual functional capacity assessment used at steps 4

---

[12] See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04 ¶ C; id. at § 12.06 ¶ C.

and 5 "requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p)." (Tr. 42.) Accordingly, the ALJ's residual functional capacity assessment reflected the degree of limitation he had found in the "paragraph B" mental function analysis. (Tr. 42.)

At the fourth step of the sequential evaluation process, the ALJ found that the plaintiff had the residual functional capacity to perform the full range of medium work as defined in 20 C.F.R. § 416.967(c), and that the plaintiff was limited to performing low-stress, simple jobs due to symptoms of depression and anxiety. (Tr. 42.) In considering the plaintiff's symptoms, the ALJ was required to follow a two-step process: (1) the ALJ had to determine whether there was an underlying medically determinable impairment that could reasonably have been expected to produce the claimant's pain or other symptoms; and (2) the ALJ then had to evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limited the claimant's functioning. (Tr. 43.)

Here, the ALJ found that although the plaintiff's medically determinable impairments could reasonably be expected to cause some degree of her alleged symptoms, the plaintiff's "statements

24

concerning the intensity, persistence and limiting effects of these symptoms cannot reasonably be accepted as being consistent with the objective medical evidence . . . ."  (Tr. 44.) Specifically with respect to the plaintiff's alleged depression and anxiety, the ALJ stated that the medical records did not substantiate the plaintiff's claims of mental impairments.  (Tr. 44.)

The ALJ noted that in making this decision he "considered all records and reports submitted by the claimant, especially those from . . . Dr. Hitzeman, Dr. Pablo Ibanez and FEGS."  (Tr. 45.)  The ALJ then stated:

> Next, [I] give[] little weight to Dr. Pablo Ibanez's opinion (Exhibit 12F) because it is not supported with any treatment notes or psychiatric evaluations.  Further, his opinion is not consistent with the claimant's mild (PHQ-9) score from FEGS nor is it consistent with the claimant's admission to Dr. Hitzeman that her depression was gone (Exhibit 9F).  Therefore, [I] find[] that Dr. Ibanez's opinion is entitled to little weight because it is not supported by objective findings, it is inconsistent with the medical evidence and it is conclusory in nature.

(Tr. 45.)

### 3.

The treating physician rule requires "deference to the views of the physician who has engaged in the primary treatment of the claimant" in determining the nature and severity of the

claimant's impairment.  Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008) (internal quotation marks and citation omitted). "According to this rule, the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'"  Id. (citation omitted).

"In order to override the opinion of the treating physician . . . the ALJ must explicitly consider, inter alia: (1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist."  Selian, 708 F.3d at 418 (citing Burgess, 537 F.3d at 129).

The ALJ is also required to explain the weight given to the treating source's opinion and give good reasons for doing so. See 20 C.F.R. § 416.927(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").

Moreover, in a proceeding to determine whether a claimant is disabled, regulations require the ALJ affirmatively to develop the administrative record.  Echevarria v. Sec'y of Health & Human Servs., 685 F.2d 751, 755 (2d Cir. 1982)

(citations omitted).  "This duty arises from the Commissioner's regulatory obligations to develop a complete medical record before making a disability determination, and exists even when . . . the claimant is represented by counsel." Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996) (internal citation omitted).

"When there are gaps in the administrative record . . . [the Second Circuit Court of Appeals] ha[s], on numerous occasions, remanded to the [Commissioner] for further development of the evidence." Pratts, 94 F.3d at 39 (internal quotation marks and citation omitted).  In Pratts, the Second Circuit Court of Appeals, noting the incomplete medical record, instructed the district court to remand the matter to the Commissioner for further proceedings because the ALJ's denial of disability benefits was not supported by substantial evidence. Id. at 38-40.  Missing from the record were portions of the transcribed testimony of a medical expert, treatment notes from the claimant's social worker, and parts of the claimant's medical records.  Id. at 38.

### 4.

In this case, the ALJ's findings with respect to the plaintiff's mental impairments were insufficient.  In particular, the ALJ failed to give good reasons for assigning

little weight to the opinion of Dr. Ibanez, a treating physician
of the plaintiff.  The three reasons that the ALJ did give for
assigning "little weight" to Dr. Ibanez's opinion were not good
reasons for doing so.

The ALJ's first reason for assigning little weight to Dr.
Ibanez's opinion was that "it is not supported with any
treatment notes or psychiatric evaluations."  (Tr. 45.)
However, the ALJ could not reasonably have relied on the absence
of treatment notes because the ALJ himself had the affirmative
duty to seek any medical records to complete the file.  See
Pratts, 94 F.3d at 37; Echevarria, 685 F.2d at 755.  The
Commissioner argues that the ALJ was not required to contact Dr.
Ibanez, and that the plaintiff, represented by counsel, could
have submitted those records herself.  (Def.'s Br. at 19.)
However, it is the ALJ--not the plaintiff--who has the
affirmative duty to develop the record, even when the plaintiff
is represented by counsel.  See Pratts, 94 F.3d at 37.  This is
particularly true where the missing treatment notes belong to
the plaintiff's treating physician, and that physician's opinion
plainly differs from the opinion of a non-treating physician.
Therefore, the ALJ's first reason for assigning little weight to
Dr. Ibanez's opinion was certainly not a good reason, in view of
the ALJ's obligation to obtain those records.

The ALJ's second reason for assigning little weight to Dr. Ibanez's opinion was that "his opinion is not consistent with the claimant's mild (PHQ-9) score from FEGS nor is it consistent with the claimant's admission to Dr. Hitzeman that her depression was gone (Exhibit 9F)." (Tr. 45.)  However, this rationale is not a proper basis for assigning little weight to Dr. Ibanez's opinion.

The plaintiff was evaluated at FEGS in February 2009.  The evaluating physician at FEGS, Dr. Chan, only saw the plaintiff once, in connection with the FEGS evaluation.  Dr. Chan is not considered to be a treating physician of the plaintiff.[13]  By contrast, Dr. Ibanez is a psychiatrist whom the plaintiff had seen on at least three occasions, and the Commissioner does not dispute that Dr. Ibanez is a treating physician of the plaintiff.  Despite the requirement that greater weight generally be given to the opinion of a treating physician rather than a non-treating physician, see 20 C.F.R. § 416.927(c)(2), the ALJ assigned little weight to the opinion of Dr. Ibanez, a treating physician of the plaintiff, by stating that it was inconsistent with the opinion of Dr. Chan, a non-treating

---

[13] The Commissioner made this point clear at Oral Argument, stating that Dr. Chan saw the plaintiff in connection with the FEGS evaluation and was not a treating physician of the plaintiff.  (Transcript of Oral Argument held on December 18, 2012, at 22.)

physician of the plaintiff.  Moreover, Dr. Chan did diagnose the plaintiff with depression, although mild in severity.

In addition, while relying on the plaintiff's statement to Dr. Hitzeman that her depression was gone, the ALJ ignored the rest of the very same sentence in Dr. Hitzeman's report in which Dr. Hitzeman, a treating physician of the plaintiff, states that "many of her symptoms may be explained by depression . . . ." (Tr. 175.)  Dr. Hitzeman's opinion directly contradicts the plaintiff's statement and diminishes the significance of the inconsistency between Dr. Ibanez's opinion and the plaintiff's statement.

The ALJ's third reason for assigning little weight to Dr. Ibanez's opinion, in addition to his conclusions that "it is not supported by objective findings, [and] it is inconsistent with the medical evidence," was that "it is conclusory in nature." (Tr. 45.)  However, the record demonstrates that Dr. Ibanez completed a thorough psychiatric evaluation of the plaintiff and documented numerous findings that were not conclusory in nature. (Tr. 247-53.)

### 5.

In sum, the three reasons that the ALJ gave for assigning "little weight" to the opinion of Dr. Ibanez, a treating physician of the plaintiff, were not good reasons for doing so.

The ALJ failed to give good reasons for assigning little weight
to Dr. Ibanez's opinion, even though the ALJ was required to
give good reasons for the weight assigned to the opinion of the
plaintiff's treating source.  See 20 C.F.R. § 416.927(c)(2).
The ALJ also failed to fulfill his affirmative duty to seek out
medical records to complete the file.  See Pratts, 94 F.3d at
37; Echevarria, 685 F.2d at 755.

     If the ALJ had properly considered Dr. Ibanez's opinion and
had developed the administrative record, the ALJ could have
assigned greater weight to Dr. Ibanez's opinion, which would
have supported a finding of disability.  Given the numerous
findings of marked limitations that Dr. Ibanez made, a finding
of disability would have been indicated.  The Commissioner also
conceded at Oral Argument that had the ALJ credited Dr. Ibanez's
opinion, the ALJ would have found that the plaintiff was
disabled based upon her mental condition.  (Transcript of Oral
Argument held on December 18, 2012, at 21-22.)

     Because the ALJ failed to give good reasons for according
little weight to Dr. Ibanez's opinion and failed to develop the
administrative record, the case is remanded for further
proceedings.  The plaintiff's request for a hearing before a
different ALJ is denied because there is no indication that the
ALJ in this case was prejudiced or partial.  Cf. Sutherland v.
Barnhart, 322 F. Supp. 2d 282, 292-93 (E.D.N.Y. 2004) (remand to

a new ALJ was appropriate where the ALJ's conduct gave rise to serious concerns about the fundamental fairness of the proceedings).

## CONCLUSION

The Court has considered all of the arguments of the parties.  To the extent not specifically addressed above, the remaining arguments are either moot or without merit.  For the foregoing reasons, the Commissioner's decision is **reversed** and this case is **remanded** for further proceedings.  The Clerk is directed to enter judgment and to close this case.

**SO ORDERED.**

Dated:     New York, New York
           March 28, 2013            __/s/_____
                                         **John G. Koeltl**
                                **United States District Judge**